**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**
Judge John L. Kane

Civil Action **No. 09-cv-00091-JLK**

**COLORADO ENVIRONMENTAL COALITION,
WESTERN COLORADO CONGRESS,
WILDERNESS WORKSHOP,
BIODIVERSITY CONSERVATION ALLIANCE,
SOUTHERN UTAH WILDERNESS ALLIANCE,
RED ROCK FORESTS,
WESTERN RESOURCE ADVOCATES,
NATIONAL WILDLIFE FEDERATION,
CENTER FOR BIOLOGICAL DIVERSITY,
THE WILDERNESS SOCIETY,
NATURAL RESOURCES DEFENSE COUNCIL,
DEFENDERS OF WILDLIFE,** and
**SIERRA CLUB,**

      Plaintiffs,

          v.

**KEN SALAZAR,** Secretary of the Interior, in his official capacity;
**WILMA LEWIS,** Assistant Secretary, Land and Minerals Management, in her official capacity;
**BOB ABBEY**, Director, Bureau of Land Management, in his official capacity; and
**THE UNITED STATES DEPARTMENT OF THE INTERIOR** and
**THE BUREAU OF LAND MANAGEMENT**, federal agencies.

      Defendants, and

**AMERICAN PETROLEUM INSTITUTE** and **SHELL FRONTIER OIL & GAS INC**.,

      Intervenor Defendants.

___

**MEMORANDUM OPINION AND ORDER**
___

Kane, J.

      This matter is currently before me on Intervenor Defendants' Motion to Reopen Case and

1

Request for Oral Argument (doc. 82). Having reviewed the motion as well as the parties' briefs and exhibits and being fully apprised of the arguments contained therein, I find oral argument unnecessary. For the reasons stated below, Intervenor Defendants' motion is DENIED.

## BACKGROUND

"Oil shale" is generally defined as any sedimentary rock that contains a solid material, "kerogen," that, when heated, is released as a petroleum-like liquid. While oil shale is found in many places worldwide, the largest deposits on earth are found in the Green River Formation of Colorado, Utah, and Wyoming. Numerous attempts to develop this vast, potentially valuable resource have been made, beginning with the creation of the Naval Oil Shale Reserve in the early 20th century. Despite repeated efforts, however, this resource has remained out of reach, owing in large part to technological and financial limitations. In fact, past efforts to exploit this resource have proven financially ruinous. *See, e.g.* Clifford Krauss, *The Cautious U.S. Boom in Oil Shale*, N.Y. Times (Dec. 21, 2006), *available at* http://www.nytimes.com/2006/12/21/business/21shale.html?pagew anted=all.

Like a phoenix rising from the ashes, however, the specter of oil shale development in the American West refuses to die. Most recently, concerns over rising gas prices and increased reliance on foreign oil have spurred revived interest in the commercial development of oil shale. With these concerns in mind, Congress passed the 2005 Energy Policy Act, Pub. L. 109-58, title III, § 369, 119 Stat. 728. Among its many provisions, the act required the Secretary of the Interior to make public lands available for RD&D leases, 42 U.S.C. § 15927(c); complete a Programmatic Environmental Impact Statement ("PEIS") for a commercial leasing program for oil shale and tar sands resources on public lands with an emphasis on the most geologically prospective lands within each of the states of Colorado, Utah, and Wyoming. *Id.* at §

2

15927(d)(1); and publish a final regulation relating to the commercial leasing program for oil shale and tar sands resources on public lands, *Id.* at § 15927(d)(2).  In September 2008, the Bureau of Land Management completed the statutorily mandated PEIS, and in November 2008 it issued final regulations governing the commercial oil shale and tar sands leasing program on public lands.

In January 2009, Plaintiffs filed the instant lawsuit challenging the oil shale regulations on two grounds.[1]  Plaintiffs argued BLM had (1) failed to conduct an adequate NEPA analysis and (2) failed to justify its determination that its chosen royalty rate would both ensure a "fair return" to the United States, as required by the Energy Policy Act, and that the United States would receive "fair market value" on oil shale leases as required by the Federal Land Policy and Management Act.  *See* Complaint for Declaratory and Injunctive Relief and Petition for Review of Agency Action (doc. 1) at 30-31.  Shortly thereafter, Shell Frontier Oil & Gas, Inc. ("Shell") and the American Petroleum Institute ("API") filed, and I granted, motions to intervene.  *See* Order Granting Motions to Intervene (doc. 31).

After nearly two years of negotiations, Plaintiffs and Federal Defendants reached a settlement agreement resolving the challenges to the regulations.  According to the terms of the settlement, BLM will conduct a formal notice-and-comment rulemaking to consider whether the 2008 oil shale rules should be amended and, if so, how.  BLM agreed to propose several changes to the 2008 regulations, including removing the royalty rate from the regulations, clarifying the agency's environmental responsibilities and authority, and proposing additional environmental documentation requirements for commercial lease applications.  BLM also agreed to delay any

---

[1] Plaintiffs also filed a companion case challenging BLM's amendments to twelve Resource Management Plans impacted by the renewed push to develop Oil Shale and Tar Sands on federal lands in Colorado, Utah, and Wyoming.  *See* Civil Action No. 09-cv-00085-JLK.

calls for commercial leasing, but retained the right to continue nominating parcels for Research, Development, and Demonstration ("RD&D") leases and to convert existing RD&D leases to commercial leases.

For purposes of the instant motion, the settlement is most notable for what it did not do. The settlement did not obligate BLM to change its regulations; it did not require any action on the part of either Shell or API; it did not modify any existing contract rights; and it did not bar Shell, API, or API's members from bringing any claims against Federal Defendants. Most significantly, it did not require court approval, and it cannot be enforced through contempt proceedings.

As a condition precedent to the settlement agreement, the parties agreed to seek an administrative closure of the case while they complied with the terms of the agreement. On February 15, 2011, they filed a motion to that end. Finding that closure would conserve the court's and the parties' resources, I granted the requested stay and administratively closed the case. *See* Order re: Joint Motion for Order to Administratively Close the Case (doc. 81).[2]

Although not a party to this settlement, Intervenor Defendants seek to reopen the case so that they may challenge the settlement agreement reached by Plaintiffs and Federal Defendants. *See* D.C.COLO.Civ.R 41.2 (allowing an administratively closed case to be reopened upon a showing of good cause).

---

[2] Although the parties indicated that Intervenor Defendants intended to oppose an administrative stay, I granted the motion without the benefit of a response because I did not, and do not, believe Intervenor Defendants have any basis upon which to challenge the settlement agreement between Plaintiffs and Federal Defendants. *See* D.C.COLO.Civ.R 7.1(c) (Noting that, despite the standard deadlines for responding and replying to a motion, "[n]othing in [Rule 7.1] precludes a judicial officer from ruling on a motion at any time after it is filed").

ANALYSIS

In order to resolve Intervenor Defendants' motion, it is necessary to determine whether they have established "good cause" for the reopening of this case. They argue that "good cause" exists because reopening the case will allow them to challenge the terms of the settlement agreement entered into by Plaintiffs and Federal Defendants.[3] The question is, however, whether Intervenor Defendants have standing to challenge the settlement agreement. As non-parties to the settlement agreement, Intervenor Defendants are only entitled to contest the settlement if it required court approval or if it in some way prejudices them. I address each possibility in turn.

*Settlements Requiring Court Approval*

Ordinarily, settlement agreements need not be approved by the court. *See, e.g., Miller v. Dorr*, 262 F. Supp. 2d 1233, 1239 (D. Kan. 2003). In fact, "[c]ourts not only frown on interference by trial judges in parties' settlement negotiations, but also renounce the practice of approving parties' settlement agreements." *Gardiner v. A.H. Robbins Co., Inc.*, 747 F.2d 1180, 1189 (8th Cir. 1984); *see also In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1025 (2d Cir. 1992). The general reluctance of courts to engage in wholesale review of settlement agreements is rooted in two important policy considerations. First, "federal courts have neither the authority nor the resources to review and approve the settlement of every case brought in the federal court system." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 835 (3d. Cir. 1995). Second, in ordinary private litigation, "the parties are free at any time to agree to a resolution of the dispute by private contractual agreement, and to dismiss the

---

[3] Specifically, Intervenor Defendants argue that the settlement "violate[s] the plain language and intent of the Energy Policy Act of 2005, unlawfully impose[s] obligations on Shell as a non-settling party, and impermissibly restricts the Bureau of Land Management's administrative discretion to manage the federal oil shale program in accordance with existing federal law." Motion to Reopen Case (doc. 82) at 3.

lawsuit by stipulation." *Id.* (quoting *United States v. City of Miami*, 614 F.2d 1322, 1330 (5th Cir. 1980)).

In certain limited circumstances, however, these considerations are outweighed by other factors. Thus, settlements involving consent decrees, class actions, shareholder derivative suits, and compromises of bankruptcy claims require court approval before they can take effect.[4] *Id.* The settlement at issue in this case does not fall into any of these categories. The parties did not and were not required to seek any form of judicial imprimatur for their settlement agreement. My order was premised solely on this court's stated policy favoring the entry of stays to facilitate settlement or other means of alternative dispute resolution. D.C.COLO.Civ.R 16.6.

The fact that I have no power to enforce the terms of the settlement agreement supports this conclusion. Although the settlement agreement did not take effect until the entry of administrative closure, this was merely a "timing provision[] and ensure[d] that Defendants are not required to expend resources both defending active litigation and engaging in planning and rulemaking processes." Defendant's Opposition (doc. 84) at 12. As Defendants properly note, this did not "convert the settlement agreement[] into [a] court approved consent decree[] . . . ." *Id.*

---

[4] Intervenor Defendants also suggests that settlements involving the "public interest" require judicial approval. Although I recognize the necessity to consider the "public interest" before approving a settlement agreement, Intervenor Defendants cites no case supporting the proposition that a perceived impact on the "public interest" is an adequate independent basis requiring judicial approval of a settlement agreement. The lone case offered in support of this proposition, *Janus Films, Inc. v. Miller*, endorsed the consideration of the public interest in the context of considering a consent judgment or a settlement judgment. 801 F.2d 578, 582 (citing *Adams v. Bell*, 711 F.2d 161, 170 n.40 (D.C. Cir. 1983)); *see also United States v. Telluride Co.*, 849 F. Supp. 1400 (D. Colo. 1994) (citing *Janus Films, Inc.* for the proposition that the "public interest" must be considered before approving a consent decree). In entering the parties' requested stay, I did not approve the terms of their agreement or enter any judgment in this case. *See* Order Administratively Closing Case (doc. 81); *see also* Settlement Agreement (doc. 80-1) at 7 ¶ 15.

I have not approved the settlement agreement, and Plaintiffs and Federal Defendants were within their rights to enter into a private contract disposing, at least temporarily, of any need to litigate without seeking court approval. Thus, even were I to reopen this case, Intervenor Defendants would not have an opportunity to object to the settlement agreement.

*Prejudice*

As the Supreme Court has noted, "It has never been supposed that one party – whether an original party, a party that was joined later, or an intervenor – could preclude other parties from settling their own disputes and thereby withdrawing from litigation." *Local Number 93, Intl. Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528-29 (1986); *see also San Juan County, Utah v. United States*, 503 F.3d 1163, 1189 (10th Cir. 2007) (en banc) (intervenors have "no power to veto a settlement by other parties"). A non-party may, however, challenge a settlement agreement if it has been prejudiced by that settlement. *New England Health Care Employees Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008).

In order to establish prejudice, Intervenor Defendants must show either that the settlement interferes with their contract rights or that the settlement strips them of a legal claim or cause of action. *See New England Health Care Employees Pension Fund*, 512 F.3d at 1288 (quoting *In re Integra*, 262 F.2d at 1102-03). Intervenor Defendants argue the settlement imposes additional obligations which will interfere with their existing contract rights.

First, they argue the settlement requires BLM to conduct an additional NEPA analysis before their existing RD&D leases can be converted to commercial leases. As Federal Defendants note, however, this is not a new requirement. The settlement merely contains an acknowledgment of this obligation, which was first mentioned in the 2008 Oil Share and Tar Sands Record of Decision. *See* Approved Resource Management Plan Amendments/Record of

Decision (ROD) for Oil Shale and Tar Sands Resources to Address Land Use Allocations in Colorado, Utah, and Wyoming and Final Programmatic Environmental Impact Statement (doc. 84-2) at 38 (noting that the oil shale decision "[r]equires additional NEPA analysis . . . before the issuance of leases for commercial development . . . ."). Even if Intervenor Defendants were not aware of this language in the 2008 Oil Shale and Tar Sands Record of Decision, this very condition was acknowledged in Shell's Oil Shale Research, Development and Demonstration Lease. *See* doc. 5-2 at 15 (noting that conversion to a commercial lease was contingent on "BLM's determination, following [NEPA] analysis . . . that commercial scale operations can be conducted, subject to mitigation measures to be specified in stipulations or regulations, without unacceptable environmental consequences").[5]

Intervenor Defendants next argue that BLM's pledge to suspend commercial leasing for two years will significantly impact their existing operations. Intervenor Defendants have failed to show, however, that the two-year delay will have any real impact upon their operations. They have not alleged that they have developed viable technology that would allow them to develop oil shale on a commercial scale. To the contrary, in a companion case they have indicated they are engaged in ongoing field testing of technologies that must be perfected before they will be able to develop these resources. Decl. of Dan Whitney, (No. 09-cv-00085, doc. 65-1) at 33, ¶ 8.

---

[5] Intervenor Defendants argue that the terms of the lease leave open the application of a categorical exclusion ("CatEx") and do not necessarily require preparation of an EIS or an EA. This is not inconsistent with the settlement agreement, which only requires additional NEPA analysis and conceivably includes the development of a CatEx. Pursuant to the NEPA regulations, in order to develop a CatEx agencies must set "specific criteria" for what actions "normally do not require either an environmental impact statement or an environmental assessment". 40 C.F.R. § 1507.3(b)(2)(ii). Once the agency makes this determination, it must publish it in the Federal Register, provide opportunity for public comment, and submit the CatEx to the Council for Environmental Quality ("CEQ") for review before it can take effect. 40 C.F.R. § 1507.3(a). This constitutes "additional NEPA analysis," and Intervenor Defendants' argument is without merit.

Furthermore, the settlement agreement expressly provides for the continued solicitation of parcels to be leased for RD&D of oil shale recovery and does not foreclose the conversion of RD&D leases to commercial leases.

Finally, Intervenor Defendants argue the settlement will result in substantive changes to the Oil Shale Tar Sands Regulations. This argument is directly contradicted by the terms of the settlement. BLM has not committed to any substantive changes of the existing regulations; it has merely pledged to follow a specified process in deciding whether any amendments to the Oil Shale and Tar Sands Regulations are necessary. It is possible that, after conducting the agreed upon process, BLM will determine that no changes or amendments are required.

Intervenor Defendants have failed to establish that they are in any way prejudiced by the settlement agreement. The settlement in no way restricts the right of Intervenor Defendants to maintain a legal claim against either Plaintiffs or Federal Defendants, and it does not interfere with any existing contract right. Accordingly, they lack standing to challenge the settlement entered into by Plaintiffs and Federal Defendants.

## CONCLUSION

Plaintiffs and Federal Defendants have entered into a contractual agreement rendering litigation of Plaintiffs' complaint unnecessary. The agreement did not require court approval, and my decision to stay this proceeding to allow the parties to carry out the terms of the settlement was in no way a judgment upon the propriety of that agreement. It was based entirely on the interests of judicial economy. Although Intervenor Defendants take issue with the settlement and the Federal Defendants' decision to revisit the Oil Shale Tar Sands rulemaking process, they have failed to show that they are in any way prejudiced by the parties' settlement. Accordingly, their Motion to Reopen the Case (doc. 82) is DENIED. Absent a motion by either

the Plaintiffs or Federal Defendants, or a showing of prejudice by Intervenor Defendants, this matter will remain ADMINISTRATIVELY CLOSED pursuant to my earlier Order (doc. 81).

Dated:  May 10, 2011                                        BY THE COURT:

                                                      **/s/John L. Kane**
                                                      Senior U.S. District Judge